**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division**

| | |
|---|---|
| JACINTA ELDER,<br>9004 Crowne Springs Circle, # 103<br>Louisville KY 40241<br><br>               Plaintiff,<br><br>v.<br><br>RYAN SULLIVAN, ASHLEY BLAKE COLLINS,<br>RAYCEN RAINES, GENEVA LONE HILL, and<br>WAKPAMNI LAKE COMMUNITY<br>CORPORATION,<br><br>               Defendants. | Civil Action No. _____ |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff, Jacinta Elder ("Plaintiff"), by counsel, and for her Class Action Complaint against Defendants, she alleges as follows:

## INTRODUCTION

1.    In an attempt to circumvent state usury, payday lending, and consumer fraud statutes, Defendants Ryan Sullivan, Ashley Blake Collins, Raycen Raines, and others created and operated several criminal enterprises to market and collect illegal "payday" loans. In an apparent attempt to insulate themselves from any legal liability, Defendants established what is similar to a "rent-a-tribe" business model, where a payday lending scheme associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe—or to at least create the illusion that it enjoys tribal immunity. However, in this case, Defendants did not associate with an actual Native American tribe and instead claimed to be affiliated with a tribe that does not appear to exist.

2.    To facilitate their blatant violations of state interest-rate lending laws, Defendants helped form the Wakpamni Lake Community Corporation ("WLCC")—a holding company—

organized by several *rogue members* of the Oglala Sioux Tribe to facilitate their making of loans at annual interest rates in excess of 700%. Even though the Oglala Sioux Tribe rejected the business venture in 2011, Defendants nonetheless started the WLCC and proceeded to make high-interest loans through various websites that claimed to be owned and operated by the WLCC. *See, e.g.*, Nicholas Nehamas, *The Tribe That Said No: How One Rogue Tribal Member Tried to Drag the Oglala Sioux Into Payday Lending,* AL JAZEERA AMERICA (June 18, 2014), http://projects.aljazeera.com/2014/payday-nation/sioux-tribe-pay.html (last visited on June 28, 2017). Because Defendants could not get the Oglala Sioux Tribe to participate in their scheme, WLCC broadly held itself out as a tribal entity "owned" by the "Sioux Indians, South Dakota," *i.e.*, a tribe that does not exist.[1] These misrepresentations were part of an integrated scheme to misrepresent the WLCC's purported immunity, violate public policy, and deprive consumers of legal remedies and their day in court.

3.     This lawsuit challenges the WLCC's claims of sovereign immunity and seeks to disgorge the unlawful profits made by the WLCC, its members, any third parties, and their principals, who run all aspects of the lending business off tribal lands and without tribal

---

[1] There is no tribe called the "Sioux Indians" in South Dakota, nor is there any tribe that would refer to itself as such. The Great Sioux Nation is a confederacy of tribes consisting of sixteen modern day tribes. Steven J. Gunn, *Compacts, Confederacies, and Comity: Intertribal Enforcement of Tribal Court Orders*, 34 N.M. L. Rev. 297, 325 (2004). It is comprised of three distinct dialect groups: the Lakota, Dakota, and Nakota. Alexandra New Holy, *The Heart of Everything That Is: Paha Sapa, Treaties, and Lakota Identity*, 23 Okla. City U. L. Rev. 317, 352 n.1 (1998). The Oglala Sioux Tribe is a part of the Lakota, which is the western-most nation of the Great Sioux Nation consisting of seven bands located on the Pine Ridge, Rosebud, Cheyenne River, Standing Rock, Crow Creek, Flandreau, and Lower Brule reservations in South Dakota and North Dakota as well as the Fort Peck reservation in Montana. *Id.* "Although united by tradition, history, culture, and [an inter-tribal legislative body], the various Sioux tribes occupy separate reservations and have separate and distinct legal systems." Gunn, *supra*, at 338 n.198; *see generally* South Dakota Tribal Court Handbook (2006), (describing the distinct legal systems of the various South Dakota tribes), *available at* https://ujs.sd.gov/media/docs/IndianLaw%20Handbook.pdf.

involvement, including underwriting, funding, and collection of the loans. Even if the "Sioux Indians" of South Dakota was a valid Native American tribe that was affiliated with the enterprise pled herein, Defendants would not benefit from tribal immunity. Although the doctrine of tribal sovereign immunity protects tribes, it does not automatically extend to economic subdivisions of a tribe, and the Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners."[2] In this case, nearly all of the profits of the scheme went to non-tribal participants, the scheme was operated by non-tribal members, and the scheme was specifically designed for the purpose of evading state usury laws. Thus, even if it were technically incorporated under the laws of an actual tribe, extending the protections of tribal immunity to this scheme would not serve the policies underlying tribal sovereign immunity.

4.     Based on Defendants' conduct, Plaintiff alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which prohibits any person employed by or associated with an enterprise from collecting "unlawful debt." RICO defines "unlawful debt" as a debt incurred in "the business of lending money or a thing of value at a rate usurious under State or Federal law, *where the usurious rate is at least twice the enforceable rate*." 18 U.S.C. § 1961(6) (emphasis added). Consistent with their standard policies, Defendants charged Plaintiff with an annual interest rate in excess of 735%—more than *30 times* the enforceable rate in Maryland. Defendants acted in concert to repeatedly violate Maryland's consumer loan and usury laws and collected unlawful debts from Plaintiff and the putative class members.

---

[2] *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citing *Gavle v. Little Six, Inc.,* 555 N.W.2d 284, 293 (Minn.1996)).

5.      Plaintiff also alleges a class claim pursuant to Maryland's interest and usury law, which prohibits any company from making such loans to Maryland residents at annual percentage rates in excess of 24% unless certain exceptions not present here have been met. Md. Code, Com. Law § 12-103(c)(1)-(2). If an unlicensed lender makes a loan for less than $6,000 and charges interest in excess of 24%, such loans are void and unenforceable and the lender or any third-party may not collect, obtain or receive any principal, interest, or charges whatsoever on said loans. Md. Code, Com. Law § 12-314; *see also In the Matter of: Archway Holdings Group, LLC*, 2014 3645140, at *1 (MD Comm. Fin. Regs. 2014). Defendants' Payday Lending Companies are not, and have not been, licensed by the Maryland Commissioner of Financial Regulation to provide short-term consumer loans under the MCCL. Accordingly, Plaintiff seeks to disgorge all payments made by Maryland consumers plus three times the interest paid to Defendants. Md. Code, Com. Law § 12-314(b)(2); Md. Code, Com. Law § 12-114.

6.      Finally, Plaintiff seeks a declaratory judgment that Defendants' arbitration and choice-of-law provisions are unenforceable as a matter of public policy and because the provisions attempt to deprive consumers of both a remedy and of a day in court. Defendants' arbitration and choice-of-law provisions are illusory, unreasonable, and unconscionable because the loan agreements indicate that the "laws of the Tribe will govern this Agreement." (*See generally* July 1, 2013 Loan Agreement, attached as Exhibit 1). Moreover, Defendants' arbitration and choice-of-law provisions are unenforceable because it violates public policy concerns in Maryland and was procured through misrepresentations, including that WLCC was "wholly owned" and "operated by" a nonexistent tribe. These misrepresentations created the appearance that Plaintiff and the class members were doing business with a legitimate tribal government when, in reality, all aspects of the transaction were controlled by non-tribal participants like Sullivan and Collins.

4

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 15 U.S.C. § 1692k(d). The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §§ 1367 and 1332(d)(2).

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b) and Local Rule 501(4)(b)(iii) because of the events described in this Complaint took place in this District and Division.

**PARTIES**

9.      Plaintiff Jacinta Elder is a natural person who resided in this District and Division at the time during which a substantial part of the events or omissions giving rise to the claims asserted herein occurred.

10.      Defendant Ryan Sullivan ("Sullivan"), is a natural person who resides in Kansas City, Missouri. During all times relevant hereto, Sullivan directed, controlled and owned some of the internet lending websites described above, including SeasidePayday.com, BeachsideCash.com, Blvdcash.com, FiresideCash.com, Baysidecash.com, and Whisper Rock, LLC, which he set up to market and collect illegal loans under the disguise of the WLCC. Sullivan is one of the architects of the illegal enterprise described herein and had direct personal involvement in the creation and operation of the illegal enterprise.

11.      Defendant Ashley Blake Collins ("Collins"), also known as Blake Collins, is a natural person who resides in Utah. During all times relevant hereto, Collins directed, controlled, and owned some of the internet lending websites described above, including Green Circle Lending and Cash Cloud, which he set up to market and collect illegal loans. Collins is one of the architects

of the illegal enterprise described herein and had direct personal involvement in the creation and operation of the illegal enterprise.

12.     Defendant Raycen Raines ("Raines") is a natural person who was born in Portland, Oregon. In 2011, Raines moved to the Pine Ridge Reservation, which is the land in South Dakota that is home to the Oglala Sioux Tribe. At all times relevant hereto, Raines was the "matchmaker," *i.e.*, the middleman who brought together Sullivan and Collins with the rogue members of the Oglala Sioux Tribe to establish the WLCC, which operates without approval from and without participation from the Oglala Sioux Tribe. The WLCC provides no benefit to the Oglala Sioux Tribe or any other tribe. Raines handles the relationship between the WLCC and the internet lending websites. Upon information and belief, Raines receives a percentage of the profits from the illegal loans for his role as the middleman.

13.     Defendant Geneva Lone Hill ("Hill") is the president of the WLCC. She is one of the rogue members of the Oglala Sioux Tribe who helped form the WLCC. Upon information and belief, Hill receives a percentage of the profits from the WLCC.

14.     Defendant Wakpamni Lake Community Corporation ("WLCC") is a privately held corporation, which operates without approval from and provides no benefit to the Oglala Sioux Tribe or any other tribe. In return for a small fraction of the profits, WLCC allows internet payday lending websites to use its name and falsely claim that they are "wholly-owned" and "controlled by" the WLCC. The WLCC does not participate in the day-to-day operations of the payday lending websites and does not perform any of the work in originating, underwriting, or financing the loans. The WLCC also does not handle the servicing of or collection of the illegal loans.

## FACTS

### A.    Overview of Defendants' Enterprise.

15.    Over the last decade, businesses have sought to evade state lending laws by entering into ventures with Native American tribes to shield the businesses through use of tribal sovereign immunity. *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052, 188 L. Ed. 2d 1071 (2014) (Scalia, J., dissenting) ("[P]ayday lenders (companies that lend consumers short-term advances on paychecks at interest rates that can reach upwards of 1,000 percent per annum) often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality." (citing Martin & Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 WASH. & LEE L. REV. 751, 758–759, 777 (2012)).

16.    Before embarking on the tribal lending scheme, Collins set up an online lending company named Flobridge in 2009, which was quickly shut down after a lawsuit brought by the Idaho Department of Finance revealed that the payday lending company operated without a license and unlawfully used wage assignments to garnish consumers' wages. *See, e.g., Idaho v. Flobridge Group, LLC*, Case No. 2010-6-04 (Idaho).

17.    A similar enforcement action was brought against Sullivan and his company, Fireside Cash, by the Department of Financial & Professional Regulation for the state of Illinois.

18.     In order to continue doing business and evade state usury laws, Collins and Sullivan teamed up with Defendant Raines, a former insurance salesman originally from Oregon, who has Oglala lineage and moved to the Pine Ridge Reservation in 2011.

19.    Although Raines is an enrolled member of the Oglala Sioux Tribe, he is not a tribal official and does not represent or act on behalf of the Oglala Sioux Tribe or any other tribe.

20.     In January 2012, Raines approached members of the Wakpamni District—one of the nine subdivisions of the Pine Ridge Reservation—with a business opportunity to enter the internet payday lending market with Collins and his affiliated websites, such as Cash Cloud—an Arizona company.[3]

21.     During a meeting in January 2012, Raines presented members of the Wakpamni District with a proposed partnership agreement to do business with Cash Cloud.

22.     As compensation for its role in the deceptive scheme, Cash Cloud would pay the Wakpamni District $5 per new loan initiated by Cash Cloud with a net minimum payment of $100,000 per month.

23.     Under the proposed partnership agreement, the proceeds would be paid into a bank account held by Raines, who would remit 50% of the proceeds to the Wakpamni District.

24.     Ultimately, the Wakpamni Board rejected the business venture, but Raines set up the WLCC with a few rogue members of the Wakpamni district and proceeded to make the loans without the Oglala Sioux Tribe's permission.

25.     A 2012 CNBC report details certain of the details of the Oglala Sioux Tribe's ultimate decision to not involve itself in the business venture.  *See* Eamon Javers, *How Some Payday Landers Charge Over 700% On Loans,* CNBC (Sept. 17, 2012).[4]  When the tribal secretary was contact by CNBC and informed that the Fast Money Store website (then www.fastmoneystore.net) stated that it was affiliated with the Wakpamni, he responded "We were not aware of this payday lending project on the Internet until you brought it to our attention.  We believe that a fraud has been committed on us and these individuals pulled a fast one on us."

---

[3] A portion of the factual allegations are taken from Al Jazeera America's investigation into Raines and the WLCC, as well as other lawsuits and government enforcement actions against similar tribal lending schemes.
[4] *Available at* http://www.cnbc.com/id/49035819.

Indeed, even the tribal president, whose signature appeared on a Fast Money Store contract, admitted to CNBC that the contract had not been made according to tribal procedure.

26.     Although the WLCC holds itself out as the actual lender of these internet payday loans, Collins, Sullivan, and others not yet known to Plaintiff performed the underwriting requirements, funded the loans, and controlled all aspects of the servicing after the initiation of the loan.

27.     Nevertheless, WLCC erroneously held itself out as an "arm and instrumentality" of the "Sioux Indians" even though no such tribe exists and no tribe participates in any of the business functions of the WLCC or receives any of the illegal profits from the scheme.

28.     Aside from Cash Cloud, the WLCC has allowed its name to be used by no less than 16 internet payday lending companies, including Seaside Payday, BlvdCash, Whisper Rock, Green Circle, The Gan Eden Group, First Day, Fox Hills Cash, Rolling Plains Cash, Check Advance USA, Arrow Head Advance, Cash on Cloud9, Easy Cash Online Store, Bayside Cash, Fast Money Store, Fireside Cash, Seaside Dollar, and (collectively "Defendants' Payday Lending Companies").

29.     Upon information and belief, WLCC entered into a partnership agreement with each of Defendants' Payday Lending Companies and each of the individual Defendants executed at least one of the partnership agreements.

30.     Under the scheme, loans are made in the name of WLCC, but Sullivan, Collins, and others not yet known to Plaintiff, provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

31.     Upon information and belief, Sullivan, Collins, and others controlled all aspects of Defendants' Payday Lending Companies claimed to be "wholly owned" and "controlled by" the WLCC, including the call centers, the loan software, the advertising, and the servicing of the loans.

32.     Upon information and belief, the Payday Lending Companies often shared employees, computer systems, and other operating costs—none of which were paid by the WLCC or any tribe.

33.     Upon information and belief, the WLCC had no control over the income or expenses of any of Defendants' Payday Lending Companies and no entitlement to the profits of the companies except for the nominal, flat-fee paid to the WLCC.

34.     In other words, the WLCC allows these companies to use WLCC's name as a front and, in return, receives a small fee for each loan.

35.     Upon information and belief, the small fee generated for use of the WLCC's name is retained by the rogue members who formed WLCC, including its president, Defendant Geneva Lone Hill and Raycen Raines.

36.     Upon information and belief, no member of a tribe or the Wakpamni subdivision participates in the day-to-day operations of the payday lending companies, and all such activities occur off the Pine Ridge Reservation.

37.     Indeed, Plaintiff's Loan Agreement listed Seaside's address as 35 New Road, PO Box 2391, Belize City. (July 1, 2013 Loan Agreement, attached as Exhibit 1, at 4).

38.     Moreover, all activities performed on behalf of the payday lending companies are not performed by employees located on the Pine Ridge Reservation but instead by employees located in Kansas, Utah, Florida, and Belize City.

39.     Upon information and belief, the money loaned to Plaintiff was transferred from a bank account owned and operated or controlled by Sullivan or other third parties not yet known to Plaintiff who have no connection to a tribe or the Pine Ridge Reservation.

40.     For example, the United States Attorney for the Southern District of New York has indicted Scott Tucker and Timothy Muir, competitors of Defendants, for engaging in exactly the same type of unlawful-lending "rent a tribe" and collection practices alleged herein.

41.     The Tucker indictment, which sets out a strikingly similar set of facts, includes: (1) Mr. Tucker, through the use of shell companies, personally lent money to thousands of consumers through payday loans; (2) Tucker personally controlled virtually every aspect of the operations of these sham entities; (3) these sham entities shared employees, computer systems, and "other operating costs and infrastructure of a single lending business"; and (4) Mr. Muir acted as general counsel for one of the Tucker entities. *United States v. Tucker*, Case No. 16-crim-091 (S.D. N.Y. Feb. 9, 2016) (Dot. 1 at ¶¶ 1–3).

42.     For example, the indictment explains:

In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1–3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

Similarly, to create the sham appearance that Tribes 1–3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the

11

extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

*Id*. at ¶¶ 23-24.

43.     Just like the Tucker defendants, Defendants' business relationship was nothing more than an attempt to mislead consumers and regulators by an illusion that Defendants were protected by tribal immunity.

> **B.     Defendants' Loans Charged Interest in Violation of Md. Code, Com. Law § 12-103, Md. Code, Com. Law § 12-306 and RICO.**

44.     Sullivan, Collins, and others not yet known to Plaintiff, through Defendants' Payday Lending Companies, marketed WLCC internet loans to Maryland residents.

45.     Under the terms of the standard Loan Agreements, the annual interest rates charged were at least twice the 24% cap imposed by Maryland law.

46.     Specifically, Defendants charged Ms. Elder with an annual percentage rate ("APR") of 735.0728% (July 1, 2013 Loan Agreement, attached as Exhibit 1).  Ms. Elder's loan in the amount of $500.00 was to be paid back in 32 bi-weekly payments for a total finance charge of $3,870.00, including $3,375.00 in interest.

47.     Md. Code, Com. Law § 12-103 prohibits any person from making such loans to Maryland residents in excess of 24% APR unless certain exceptions not present here are met.

48.     Md. Code, Com. Law § 12-306 prohibits any person from making payday loans to Maryland residents in excess of the following rates:

> For any loan with an original principal balance of $2,000 or less, the maximum interest rate is:
>
> (i) 2.75 percent interest per month on that part of the unpaid principal balance not more than $500;

12

(ii) 2 percent interest per month on that part of the unpaid principal balance that is more than $500 but not more than $700; and

(iii) 1.25 percent interest per month on that part of the unpaid principal balance that is more than $700.

(3) For any loan with an original principal balance of more than $2,000 and not more than $3,500, the maximum interest rate is 1.75 percent interest per month on the unpaid principal balance of the loan.

Md. Code, Com. Law § 12-306.

49.     Moreover, no person may make a loan under the MCCL without being licensed by the Maryland Commissioner of Financial Regulation.  Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204.  Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under [the MCCL]."

50.     Failing to acquire the appropriate license in Maryland is part of a pattern of conduct by the WLCC to evade state and federal law across the country. For example, the Department of Financial Institutions of the State of Washington, in response to complaints about many payday lending websites operated by the WLCC, has previously notified Washington consumers that the WLCC is not licensed there. *See* The Wakpamni Lake Corporation Not Licensed In Washington, *available   at*   http://www.dfi.wa.gov/consumer/alerts/wakpamni-lake-corporation-not-licensed-washington.

51.     Defendants' Payday Lending Companies are not, and have not been, licensed by the Maryland Commissioner of Financial Regulation to provide short-term consumer loans under the MCCL.

52.     Upon information and belief and as evidenced by the loan made to Plaintiff and the loans made by Defendants to the plaintiffs in a lawsuit against many of the same defendants pending in federal court in Virginia, *Wiley et al. v. Jardine et al.*, No. 3:17-cv-00011-MHL (E.D.

Va. filed Jan 5, 2017), all of Defendants' loans to Maryland consumers contained interest rates over 24% per year and also in excess of the rates set forth in Md. Code, Com. Law § 12-306.

53.     Accordingly, Defendants' loans were null and void, and it is unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges whatsoever on said loans, including any amounts paid by Plaintiff.

54.     Defendants received no less than $450.00, which was applied either entirely or almost entirely to interest, from Ms. Elder as a result of the $500.00 illegal loan made to her by Seaside Payday.

55.     Pursuant to Md. Code, Com. Law § 12-114, Plaintiff and the putative class members are also entitled to recover from Defendants an amount equal to the greater of (i) three times the amount of interest paid in excess of 24% or (ii) $500.

56.     Similarly, pursuant to Md. Code, Com. Law § 12-314, Plaintiff and the putative class members are entitled to recover from Defendants any principal, interest, or other compensation paid to Defendants with respect to all loans.

57.     Based on this conduct, Defendants also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

58.     RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

59.     As reflected by Plaintiff's Loan Agreement, Defendants charged an interest rate far more than twice the enforceable rates established by Md. Code, Com. Law § 12-103 and Md. Code, Com. Law § 12-306, and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

60.     As a result of Defendants' participation in the enterprise and violations of RICO,

Defendants are jointly and severally liable to Plaintiff and the putative class members for their

actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**D.     Defendants' Choice-of-Law and Arbitration Provisions Are Unenforceable.**

61.     Defendants' loan agreements not only violate Maryland's public policy against

usurious loans, but they also contain illusory, unenforceable, and unconscionable choice-of-law

and arbitration provisions that seek to disclaim all laws and deprive consumers of remedies and

their day in court.

62.     In particular, Plaintiff's Loan Agreement provides:

**GOVERNING LAW**: The laws of the Tribe will govern this Agreement. However, any dispute arising out of this Loan Agreement and any renewal thereof will be subject to the ARBITRATION PROVISION, which is governed by the Federal Arbitration Act.

63.     Upon information and belief, the governing law provision—a virtually identical

equivalent thereof—was template language included in all loan agreements involving the WLCC.

64.     Defendants' choice-of-law provision is illusory and unenforceable because it

mandates use of the tribal law of the "Sioux Indians," which does not exist. *Hayes v. Delbert*

*Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016) ("But a party may not underhandedly convert a

choice of law clause into a choice of no law clause.").

65.     Defendants' governing law clause is further unenforceable because it violates

public policy concerns in Maryland and was procured through fraud and misrepresentations,

including that WLCC was "wholly owned" and "operated by" by "the Sioux Indians" of South

Dakota.

66.     These statements were false, misleading, and designed to create the appearance that

consumers were doing business with a neutral, government-like entity, which does not exist.

67.     In reality, the loans were owned and operated by individuals like Sullivan and Collins, who funded the loans, controlled the underwriting, and handled the day-to-day operations of the businesses, including the interactions with consumers and collections.

68.     Due to the unavailability of the chosen law and/or the fraudulent misrepresentations regarding the ownership and operations of the WLCC, the arbitration provision is also illusory and unenforceable.

69.     Plaintiff requests the Court to enter a declaratory judgment that the governing law and arbitration provisions are unenforceable as to Maryland consumers.

<u>COUNT ONE</u>:
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

70.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

71.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of a class initially defined as:

> All Maryland residents who (1) executed a loan with Defendants' Payday Lending Companies or any other entity affiliated with the WLCC (2) where the loan was originated and/or any payment was made on or after June 30, 2013.

> Plaintiff is are a member of this class.

72.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

73.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

74.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

75.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class, because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class. Plaintiff and her counsel possess no interest that would interfere with their vigorous pursuit of this action.

76.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to

the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

77.    **Injunctive Relief Appropriate for the Class.** **Fed. R. Civ. P. 23(b)(2).** In addition, class certification is appropriate because Defendant acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiff and the Class members. Plaintiff and the putative class seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of usurious debt; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

78.    As alleged above, Defendants, along with other participants not yet known to Plaintiff, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

79.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

80.    All of the loans made to Maryland residents by Defendants and their affiliated companies included an interest rate far in excess of twice the enforceable rate in Maryland.

81.    This conduct began sometime as early 2012 and continues to date and will be repeated again and again in the future to the detriment of Maryland consumers.

82.    Plaintiff and the putative class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees or other sums collected by Defendants.

83.     As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiff and the putative class members for their actual damages, treble damages, costs, and attorneys fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

84.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

85.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of a class initially defined as:

> All Maryland residents who (1) executed a loan with Defendants' Payday Lending Companies or any other entity affiliated with the WLCC (2) where the loan was originated and/or any payment was made on or after June 30, 2013.

Plaintiff is are a member of this class.

86.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

87.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

88.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

89.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class. Plaintiff and her counsel possess no interest that would interfere with their vigorous pursuit of this action.

90.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

91.     **Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2).** In addition, class certification is appropriate because Defendant has acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiff and the Class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest

themselves of any interest in any enterprise pled herein, including the receipt of usurious debt; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

92.     As alleged above, Defendants, along with other participants not yet known to Plaintiff, violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c), including the partnership agreement entered into between the WLCC and the Payday Lending Companies.

93.     As explained above, Defendants knowingly entered into a series of agreements to facilitate the illegal lending scheme, which blatantly violates § 1962(c) of RICO.

94.     Plaintiff and the class members suffered actual damages as a result of Defendants' violations of 18 U.S.C. § 1962(d).

95.     As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiff and the putative class members for their actual damages, treble damages, costs, and attorneys fees pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE:
## VIOLATIONS OF MARYLAND INTEREST AND USURY LAW
## MD. CODE, COM. LAW § 12-101, *ET SEQ.*
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

96.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

97.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of a class initially defined as:

> All persons (1) who resided or were located in Maryland; and (2) when they entered into a loan with one of Defendants' Payday Lending Companies or any other entity affiliated with the WLCC.

> Plaintiff is a member of this class.

98. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

99. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

100. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

101. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class. Plaintiff and her counsel possess no interest that would interfere with their vigorous pursuit of this action.

102. **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendant acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiff and the Class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any

interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

103.    Pursuant to Md. Code, Com. Law § 12-103(c)(1)-(2), unsecured written loan agreements at an interest rate greater than 24% per annum are prohibited.

104.    As set forth more fully above—in the course of making and collecting on payday loans to Plaintiff Elder and other consumers in Maryland—Sullivan, Collins, and Defendants' Payday Lending Companies repeatedly and knowingly charged, demanded, and accepted interest at a rate greater than 24% per annum in violation of Md. Code, Com. Law § 12-103(c)(1)-(2).

105.    None of the exceptions to and within Md. Code, Com. Law § 12-103 apply.

106.    Accordingly, Plaintiff and the putative class members are entitled to recover from Defendants an amount equal to the greater of (i) three times the amount of interest paid in excess of 24% or (ii) $500.  Md. Code, Com. Law § 12-114.

**COUNT FOUR:**
**VIOLATIONS OF MARYLAND CONSUMER LOAN LAW**
**MD. CODE, COM. LAW § 12-301, *ET SEQ.***
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

107.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

108.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of a class initially defined as:

All persons (1) who resided or were located in Maryland; (2) when they entered into a loan with one of Defendants' Payday Lending Companies or any other entity affiliated with the WLCC; and (3) made a payment of any amount on the loan or who have an outstanding balance on the loan.

Plaintiff is a member of this class.

23

109.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

110.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

111.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

112.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class, because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class. Plaintiff and her counsel possess no interest that would interfere with their vigorous pursuit of this action.

113.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and

expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

114.   **Injunctive Relief Appropriate for the Class.** **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendant acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiff and the Class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of usurious profits; prohibiting Defendants from continuing to engage in any enterprise pled herein.

115.   Maryland's Consumer Loan Law ("MCCL") limits the annual interest rate on payday loans as follows:

> For any loan with an original principal balance of $2,000 or less, the maximum interest rate is:
>
> (i) 2.75 percent interest per month on that part of the unpaid principal balance not more than $500;
>
> (ii) 2 percent interest per month on that part of the unpaid principal balance that is more than $500 but not more than $700; and
>
> (iii) 1.25 percent interest per month on that part of the unpaid principal balance that is more than $700.
>
> (3) For any loan with an original principal balance of more than $2,000 and not more than $3,500, the maximum interest rate is 1.75 percent interest per month on the unpaid principal balance of the loan.

Md. Code, Com. Law § 12-306.

116.     Moreover, if an unlicensed lender makes a loan for less than $6,000 and charges interest in excess of 24%, such loans are void and unenforceable, and the lender or any third-party may not collect, obtain, or receive any principal, interest, or charges whatsoever on said loans. Md. Code, Com. Law § 12-314.

117.     As set forth more fully above—in the course of making and collecting on payday loans to Plaintiff Elder and other consumers in Maryland— Sullivan, Collins, and Defendants' Payday Lending Companies repeatedly and knowingly charged, demanded, and accepted interest far in excess of 24%.

118.     Accordingly, it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including all amounts paid by Plaintiff.

**COUNT FIVE:**
**DECLARATORY JUDGMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

119.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

120.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of a class initially defined as follows:

> **Declaratory Judgment Class**: All Maryland residents who (1) executed a loan with Defendants' Payday Lending Companies; (2) which contained a choice-of-law provision, arbitration provision, or forum selection clause similar or identical to Plaintiffs.

> Plaintiff is a member of the subclass.

121.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and

addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

122. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loan agreements are void as a matter of public policy and (2) whether the choice-of-law and arbitration provisions are enforceable.

123. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member.  In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

124. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class, because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Plaintiff and her counsel possess no interest that would interfere with their vigorous pursuit of this action.

125. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and

expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

126.    As explained above, Defendants' loan agreements not only violate Maryland's public policy, but they also contain unconscionable choice of law and arbitration provisions that are void and unenforceable for public policy concerns.

127.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the choice of law and forum-selection provisions.

128.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

129.    Accordingly, Plaintiff seeks a declaratory judgment that the choice of law and arbitration provisions are void and unenforceable as a matter of Maryland's well-established public policy.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court enter judgment on behalf of herself and the classes she seeks to represent against Defendants as follows:

A.      Certification for this matter to proceed as a class action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3);

B.      Declaratory, injunctive, and damages relief as pled herein;

C.      Attorneys' fees, litigation expenses, and costs of suit; and

D.      Such other or further relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**JACINTA ELDER**

By:   /s/  Hassan Zavareei
Hassan Zavareei (No. 18489)
Jeffrey Kaliel (*pro hac vice* pending)
Andrew Silver (*pro hac vice* pending)
TYCKO & ZAVAREEI LLP
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
P: (202) 973-0900
F: (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com
asilver@tzlegal.com

*Counsel for Plaintiff*