**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | | |
|---|---|---|
| JACINTA ELDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 8:17-cv-01807-TDC |
| | ) | |
| RYAN SULLIVAN, ASHLEY BLAKE | ) | |
| COLLINS, RAYCEN RAINES, GENEVA | ) | |
| LONE HILL, and WAKPAMNI LAKE | ) | |
| COMMUNITY CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF RYAN SULLIVAN'S MOTION TO
STAY AND COMPEL ARBITRATION OR, IN THE ALTERNATIVE, DISMISS**

Paula M. Junghans (Trial Bar No. 586)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, D.C. 20036-5807
Tel: (202) 788-1800
Fax: (202) 882-8106
pjunghans@zuckerman.com

Patrick J. McInerney (*pro hac vice*)
Angus W. Dwyer (*pro hac vice*)
SPENCER FANE LLP
1000 Walnut Street, Suite 1400
Kansas City, Missouri 64105
Tel: (816) 474-8100
Fax: (816) 474-3216
pmcinerney@spencerfane.com
adwyer@spencerfane.com

*Counsel for Defendant Ryan Sullivan*

WA 10235106.2

## TABLE OF CONTENTS

ARGUMENT ...........................................................................................................4

I.   The Court Should Enforce the Agreement to Arbitrate and Compel Arbitration. ...........4

    A.   The Loan Agreement Contains a Binding Arbitration Provision. ..........................6

    B.   The Arbitration Provision is Enforceable...........................................................7

        1.   The Issues Plaintiff Identifies in Her Complaint Do Not Preclude
            Enforcement of the Agreement to Arbitrate. ..............................................7

        2.   *Hayes* Does Not Bar Enforcement. ..........................................................9

        3.   *Dillon* Does Not Bar Enforcement. ........................................................11

    C.   Sullivan is Entitled to Enforce the Arbitration Provision Despite Not
       Being a Party to It. ......................................................................................12

    D.   Under the FAA, the Court Must Compel Arbitration. ........................................13

II.  In the Alternative, the Court Should Dismiss the Action. ...............................................14

    A.   The Complaint Should Be Dismissed Under *Forum Non Conveniens* or
       Tribal Exhaustion Doctrine Pursuant to the Court's Inherent Powers.................14

        1.   Under the Doctrine of *Forum Non Conveniens*, the Appropriate
            Forum for this Dispute is an Oglala Sioux Tribal Court. .........................17

            a.   The Tribal Court is an Available and Adequate Forum................18

            b.   The Private Factors Favor the Tribal Court.................................19

            c.   The Public Factors Favor the Tribal Court..................................20

            d.   Neither Federal Question Jurisdiction Nor Plaintiff's RICO
               Claims Preclude Dismissal Under *Forum Non Conveniens*..........22

            e.   Plaintiff's Choice of the District of Maryland is Not
               Entitled to Greater Deference  Because This is Not Her
               "Home" Forum. ........................................................................22

            f.   Dismissal Under *Forum Non Conveniens* is Warranted. ..............23

        2.   Dismissal Under the Tribal Exhaustion Doctrine is Appropriate. ............24

    B.   The Court Should Dismiss Under Fed. R. Civ. P. 12(b)(6). ...............................27

        1.   The Complaint Fails to State a Claim on the State-Law Claims...............27

            a.   The Complaint Fails to Plausibly Allege Any Basis for
               Holding Sullivan Personally Liable for Any Violation of
               State Law. ...............................................................................27

            b.   Plaintiff's State-Law Claims Are Time-Barred............................30

        1.   The Complaint Fails to State a Claim on the RICO Counts. ....................31

WA 10235106.2

a.  Plaintiff's RICO Claims Are Insufficient Because She Has Failed to Properly Allege an Underlying Usury Claim.................31

b.  Plaintiff's RICO Claims Are Insufficient Because Plaintiff Has Failed to Allege That She Suffered Any Economic Injury. .......................................................................................32

CONCLUSION ...........................................................................................................33

WA 10235106.2

Defendant Ryan Sullivan ("Sullivan"), by and through the undersigned counsel, respectfully submits this memorandum of law in support of his Motion to Stay and Compel Arbitration or, in the Alternative, Dismiss. The loan agreement (the "Loan Agreement") that serves as the basis for the suit by Plaintiff Jacinta Elder ("Plaintiff") contains a binding agreement to arbitrate, which this Court is required to enforce by the Federal Arbitration Act ("FAA"). In the alternative, if the Court for whatever reason declines to enforce the arbitration provision, the Complaint should be dismissed. This action should be dismissed under either the doctrine of *forum non conveniens* or tribal exhaustion since, Plaintiff's claims, such as they are, turn on the question of whether Wakpamni Lake Community Corporation ("WLCC") was a *bona fide* tribal entity, an issue more appropriately decided in an Oglala Sioux tribal court. Moreover, the Complaint fails to state a claim under state law because allegedly usurious loan was not made by Sullivan and the Complaint is devoid of any plausible, non-conclusory allegations sufficient to hold him vicariously liable for it and Plaintiff's claims state-law claims are time-barred. The Complaint fails to state a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") because Plaintiff has no viable underlying usury claim and does not allege that she has suffered any economic injury, a requisite to sustain Plaintiff's claims under RICO.

## ARGUMENT

**I.      The Court Should Enforce the Agreement to Arbitrate and Compel Arbitration.**

As an initial matter, the Court should issue an order compelling arbitration and staying this action pursuant to the FAA. Where an action is pending that involves a matter covered by an arbitration agreement, the Court must issue an order compelling arbitration. *See* 9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for

WA 10235106.2

such agreement, would have jurisdiction … for an order directing that such arbitration proceed in the manner provided for in such agreement. … [U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.")  Under such circumstances, the Court should also stay that action.  *See* 9 U.S.C. § 3 ("If a suit or proceeding be brought in any of the courts of the United States upon an issue referable to arbitration under an agreement in writing for such arbitration, the court in which suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.")

The FAA applies here and the arbitration agreement within the Loan Agreement should be enforced.  "Application of the FAA requires demonstration of four elements: (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision which purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of the [non-movant] to arbitrate the dispute."  *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 696 n.6 (4th Cir. 2012).  The first, third and fourth elements of are readily established. There exists a dispute between the parties concerning the Loan Agreement and whether, by allegedly participating in the making of the loan memorialized by the Loan Agreement, Sullivan and the other defendants violated federal and Maryland law.  Plaintiff presumably does not dispute this fact.  Similarly, Plaintiff presumably does not dispute that there is a relationship between this dispute and the Loan Agreement, since she herself attached the Loan Agreement as

WA 10235106.2

an exhibit to her Complaint, or that the alleged loan, made by a South Dakota-based entity to a then-resident of Maryland, involved interstate commerce.  Finally, Plaintiff presumably does not dispute that she has not complied with the agreement to arbitrate, since she both filed the instant action and argues in her Complaint that the agreement to arbitrate in the Loan Agreement is invalid and does not bind her.  *See* Doc. No. 1 at ¶¶ 68-69.  The only actual dispute is over whether there is a binding and enforceable agreement to arbitrate.  Even here, however, Plaintiff's arguments to the contrary are without merit.

### A.    The Loan Agreement Contains a Binding Arbitration Provision.

The Loan Agreement contains an agreement to arbitrate.  *See* Doc. No. 1-1 at 7-9. Plaintiff acknowledges the existence of the arbitration provision in the Loan Agreement in her Complaint.  *See* Doc. No. 1 at ¶ 68.  The arbitration provision is broad in scope:

> **SCOPE OF THE ARBITRATION AGREEMENT.**  For purposes of this Arbitration Agreement, the words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation (a) all claims, disputes, or controversies arising from or relating directly or indirectly to the signing of the Arbitration Agreement, the validity and scope of this Arbitration Agreement, the matters subject to arbitration under this Arbitration Agreement, and any claim or attempt to set aside this Arbitration Agreement, including without limitation on the basis of unconscionability; (b) all federal or state law claims, disputes, or controversies, arising from or relating directly or indirectly to the Loan Agreement, the information you gave us before entering into the Loan Agreement, including the customer information application, and/or any past agreement or agreements between you and us; (c) all counterclaims, cross-claims, and third-party claims; (d) all common law claims, based upon contract, tort, fraud, or other common law theories; (e) all claims based upon violation of any state or federal constitution, statute, or regulation; (f) all claims asserted by us against you, including claims for money damages to collect any sum we claim you owe us; (g) all claims asserted by you against us and/or any of our employees, agents, directors, officers, shareholders, governors, managers, members, parent company, affiliated entities, successors, assigns, or subsequent holders of your promissory note (hereinafter collectively referred to as "related third parties"), including claims for money damages and/or equitable or injunctive relief; (h) all claims asserted on your behalf by another person; (i) all claims asserted by you as a private attorney general, as a class representative, or in any other representative capacity, or as a member of any class or putative class asserting claims against us

WA 10235106.2

or any related third parties, (hereinafter referred to as "Representative Claims"); and/or (j) all claims arising from or relating directly or indirectly to the disclosure by us or related third parties of any non-public personal information about you.

Doc. No. 1-1 at 7.  Via subsections (b), (e), (g) and (i) of this paragraph, the arbitration provision covers the present dispute over whether the loan memorialized in the Loan Agreement was lawful or violated federal and Maryland law.  Therefore, assuming the arbitration provision is enforceable, the FAA requires that this Court compel arbitration and stay this action.

**B.     The Arbitration Provision is Enforceable.**

The arbitration provision in the Loan Agreement is enforceable.  In the Complaint, Plaintiff contends that the arbitration provision is not enforceable, because the choice-of-law clause is allegedly illusory and because the alleged fraud founded in WLCC's putatively false claim of tribal backing.  *See* Doc. No. 1 at ¶ 68.  The claimed defects are, in fact, imaginary, but even if they were genuine the law is clear that the enforceability of an arbitration agreement is severable and must be construed on its own; the promise to submit all claims to arbitration cannot be rendered unenforceable due to the alleged invalidity of other, unrelated portions of the contract.  Moreover, neither *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017) nor *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016) prohibit enforcement of the arbitration provision in this action.  Those cases do not generally prohibit the use of arbitration clauses in loan agreements involving tribal "payday" lenders.  Instead, the *Hayes* and *Dillon* courts refused to enforce the arbitration clauses in those actions because they possessed certain specific objectionable characteristics, none of which are present here.

**1.     The Issues Plaintiff Identifies in Her Complaint Do Not Preclude Enforcement of the Agreement to Arbitrate.**

In her Complaint, Plaintiff contends that the arbitration provision in the Loan Agreement is unenforceable due to alleged defects in the choice of law provision of the contract and due to

the alleged fraud associated with WLCC's purportedly false claim that it was a tribal entity. These contentions are without basis, but even assuming *arguendo* that the Loan Agreement suffered from these defects, they would not be a basis to decline to enforce the arbitration provision.  To the contrary, the law is clear that the validity of a promise to arbitrate must be construed on its own and cannot be invalidated by alleged defects in other, unrelated provisions of the contract – or even of the contract as a whole.  *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010) ("[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court form enforcing a specific agreement to arbitrate.")*; Hayes*, 811 F.3d at 671 ("Importantly, any grounds given for revocation must concern the validity of the arbitration agreement in particular, not simply the validity of the underlying contract as a whole.") *see also Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 835 A.2d 656, 664-65 (Md. 2003) (applying same principles to the Maryland Uniform Arbitration Act).

Thus, even if the choice of law clause were defective, it would not invalidate the agreement to arbitrate; it would merely mean that the arbitrator would not be bound to apply tribal law.  And, of course, the validity of the choice of law clause is an issue for the arbitrator to decide.  *See Kemph v. Reddam*, No. 13 CV 6785, 2015 WL 1510797, at *5 (N.D. Ill. Mar. 27, 2015) ("Although the arbitration agreements provide that 'the arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation,' … the arbitrator, once chosen, would have the authority to determine whether the choice-of-law provision is valid."); *Discount Trophy & Co., Inc. v. Plastic Dress-Up Co.*, No. Civ. 3:03CV2167 (MRK), 2004 WL 350477, at *7 (D. Conn. Feb. 19, 2004) ("[W]hatever the merits of DTC's arguments regarding the validity of the choice-of-law clause, they must be presented in the first instance to the arbitrator.  Any other result would be contrary to the parties['] promise to arbitrate and to the FAA.")

WA 10235106.2

The same is true of Plaintiff's contention regarding WLCC's alleged fraud regarding its tribal status.  This could only invalidate the agreement to arbitrate if there were some plausible reason to believe that the alleged fraud specifically induced Plaintiff to agree to the arbitration provision itself – that is, that Plaintiff was somehow more likely to have agreed to resolve any disputes before an arbitrator because she (allegedly incorrectly) believed she was dealing with a tribe-affiliated entity than she would have been if she had believed she was dealing with an entity unrelated to any Native American tribe.[1]  If her claim is simply that she never would have entered into the contract at all if she had known of WLCC's (alleged) lack of tribal status, then her "fraudulent inducement" claim goes to the Loan Agreement as a whole.  The Supreme Court has repeatedly, and explicitly, declared that under such circumstances the arbitration provision should be enforced and the "fraudulent inducement" claim heard by the arbitrator.  *See Rent-A-Center*, 561 U.S. at 73-74; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."); *Prima Paint Corp. v. Floor & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967) ("[I]f the claim is fraud is fraud in the inducement of the arbitration clause itself – an issue which goes to the 'making' of the agreement to arbitrate – the federal court may proceed to adjudicate it.  But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.")

## 2.    *Hayes* Does Not Bar Enforcement.

The Fourth Circuit's recent *Hayes* decision does not bar the enforcement of the arbitration provision in the Loan Agreement.  The *Hayes* court declined to enforce the arbitration clause in that action because it contained certain specific objectionable features not present in the

---

1 Suffice it to say, the Complaint contains no allegations to this effect, and it is difficult to imagine how a plausible allegation along these lines could ever be drafted.

WA 10235106.2

Loan Agreement's arbitration provision.  The arbitration clause in *Hayes* mandated that the arbitration occur before an "authorized representative" of the tribe, despite the fact that the tribal government did not authorize arbitration and there were thus no "authorized representatives" who could conduct the arbitration.  *See id.* at 672.  Enforcing the *Hayes* arbitration clause would thus have been tantamount to condemning the plaintiff to a non-existent forum.  Here, in contrast, the parties have a broad swathe of potential arbitrators from which to choose; pursuant to the Loan Agreement, the parties can select an arbitrator from AAA or JAMS or any other "attorney, retired judge, or arbitrator registered and in good standing with an arbitration agreement" who resides within Plaintiff's federal judicial district.  *See* Doc. No. 1-1 at 7.

The *Hayes* court's other objection to the arbitration clause before it was that "purport[ed] to renounce wholesale the application of any federal law[.]"  811 F.3d at 673.  While noting that more limited waivers of procedural rights (such as class arbitration waivers) are permissible, the Fourth Circuit held that this provision was an attempt to create a "substantive waiver of federally protected civil rights" in a manner precluded by Supreme Court precedent.  *Id.* at 674.  There is no equivalent disclaimer of federal law in the arbitration provision at issue in this case.  All it contains is an ordinary choice-of-law clause which calls for the application of tribal law to the contract itself.  *See* Doc. No. 1-1 at 6.  This is permissible, as the *Hayes* court expressly acknowledged.  811 F.3d at 675 ("[P]arties are free within bounds to use a choice of law clause in an arbitration agreement to select which local law will govern the arbitration.")  It is merely a direction to the arbitrator to apply tribal substantive law concerning the rights and duties of the parties.  *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63-64 (1995).

### 3.  *Dillon* Does Not Bar Enforcement.

The arbitration agreement at issue in *Dillon* was similarly overreaching, and was struck down on that basis.  Like the *Hayes* arbitration clause, the arbitration clause in *Dillon* did not merely contain an ordinary choice of law clause.  Instead, it sought to prohibit the application of federal substantive law entirely.  *See* 856 F.3d at 332 (noting that the arbitration clause "by its own terms was 'subject solely to the exclusive laws and jurisdiction of the Otoe-Missouria Tribe of Indians, a federally recognized Indian Tribe' and provided that 'no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation'").  It thus represented an effort to waive of the signatory's substantive federal statutory rights and was prohibited under the "prospective waiver" doctrine.  *Id.* at 334.  No such issue is present here, where the Loan Agreement contains merely an ordinary choice of law provision governing the agreement itself, which does not restrict Plaintiff's ability to assert her substantive federal statutory rights.  Indeed, as discussed above, the arbitration provision of the Loan Agreement expressly contemplates that the arbitrator will be able to adjudicate Plaintiff's federal and state-law claims.  *See* Doc. No. 1-1 at 7 (claims to be submitted to arbitration under the arbitration agreement include "all federal and state law claims").  Plaintiff will still be able to pursue her RICO claims in the arbitration.  The *Dillon* court acknowledged that an ordinary choice of law provision would have been lawful and enforceable.  *See* 856 F.3d at 334 ("A foreign choice of law provision, of itself, will not trigger application of the prospective waiver doctrine.")  Since all that is at issue here is an ordinary choice of law provision, neither *Dillon* nor the prospective waiver doctrine more generally acts as a bar to enforcement.

WA 10235106.2

**C.      Sullivan is Entitled to Enforce the Arbitration Provision Despite Not Being a Party to It.**

Although Sullivan is not a direct party to the agreement to arbitrate (or to the Loan Agreement more generally), he may nevertheless enforce the arbitration provision and claim a right to demand arbitration under it.   "Non-signatories to an arbitration agreement (such as defendants) may enforce arbitration agreements when (1) principles of equitable estoppel apply because the non-signatory is being sued for conduct that is intertwined with the agreement contained in the arbitration provision; (2) the non-signatory is a third-party beneficiary of the agreement; or (3) the claim is based on conduct which the non-signatory allegedly took as the agent on behalf of the party with which the plaintiff agreed to arbitrate."  *Elder v. BMO Harris Bank*, Civil No. -JFM-13-3043, 2014 WL 1429334, at \*1 (D. Md. Apr. 11, 2014), citing *Arthur Andersen v. Carlisle*, 556 U.S. 624, 631 (2009).   Sullivan is entitled to enforce the arbitration provision under this standard.

Specifically, principles of equitable estoppel require that he be permitted to invoke the protections of arbitration provision.  As the District of Maryland previously noted in granting a motion to compel arbitration in an earlier suit brought by Plaintiff involving allegedly improper "payday lending" activity:

> There are two related but independent bases for applications of equitable estoppel: (1) "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the non-signatory;" and (2) "when the signatory to the contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both a non-signatory and one or more signatories to the contract."

*Elder*, 2014 WL 1429334, at \*1, quoting *Case Handyman & Remodeling Srvs. V. Schuele*, 959 A.2d 833, 842 (Md. Ct. Spec. App. 2008).  As in the earlier *Elder* action, both bases apply here. In order to establish her claims under RICO and Maryland state law, Plaintiff must rely on the

Loan Agreement.  She needs the Loan Agreement, for example, to show that the allegedly usurious loan was made to her at all, and to show the rate of interest charged.  Similarly, Plaintiff's whole theory of her case is that there was "substantially interdependent and concerted misconduct" between WLCC and the other Defendants, including Sullivan.  Albeit through a series of conclusory allegations, Plaintiff contends that WLCC was effectively a front and that the substantive work of the lending operation was done by others, including Sullivan.  These allegations entitle Sullivan to invoke the protections of the Loan Agreement's arbitration provision.  Plaintiff cannot on the one hand allege that Sullivan should be personally liable for a loan made pursuant to the Loan Agreement because he was "one of the architects of the illegal enterprise described herein and [that he] had direct personal involvement in the creation and operation of the illegal enterprise" (Doc. No. 1 at ¶ 10), while on the other hand taking the position that he is a complete stranger to the Loan Agreement who cannot avail himself of the agreement to arbitrate that it contains.

### D.        Under the FAA, the Court Must Compel Arbitration.

Since the arbitration provision in the Loan Agreement is enforceable (and Sullivan has standing to enforce it), the Court must compel arbitration.  As the Supreme Court has repeatedly held, the FAA embodies a federal policy in favor of enforcing arbitration agreements.  *See KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) ("The Federal Arbitration Act reflects an 'emphatic federal policy in favor of arbitral dispute resolution.'"), quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985) ("[T]he Act, both through its plain meaning and the strong federal policy it reflects, requires courts to enforce the bargain of the parties to arbitrate[.]"); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) ("Section 2 [of

WA 10235106.2

the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.")

In keeping with this fundamental policy, courts are required to enforce agreements to arbitrate.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("In line with these principles, courts must place arbitration agreements on equal footing with other contracts and enforce them according to their terms.") (internal citations omitted); *Rent-A-Center*, 561 U.S. at 67 (same).  The policy underlying the FAA also requires that any doubts concerning arbitrability be resolved in favor of arbitration.  *See Mitsubishi Motors*, 473 U.S. at 626 ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").  Since, for the reasons demonstrated above, the arbitration agreement is enforceable, the Court **must** enforce it by staying this action and compelling arbitration.  *Rent-A-Center*, 561 U.S. at 68.

## II.     In the Alternative, the Court Should Dismiss the Action.

If, for whatever reason, the Court declines to enforce the arbitration provision in the Loan Agreement, this action should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and/or under the Court's inherent power to control its own docket.

### A.     The Complaint Should Be Dismissed Under *Forum Non Conveniens* or Tribal Exhaustion Doctrine Pursuant to the Court's Inherent Powers.

As discussed above, Plaintiff's claims are subject to arbitration.  However, to the extent that the Court concludes that this case should be litigated in front of a court rather than an arbitrator, the proper court to hear those claims is an Oglala Sioux tribal court.  This case is, fundamentally, about Oglala Sioux law and the inner workings of a political subdivision of the Oglala Sioux tribe.  Defendant WLCC, which was the "hub" of the lending operation that forms the basis for Plaintiff's claims, is – or at least holds itself out as – an entity formed under Oglala Sioux law by a subdivision of the Oglala Sioux tribe and which at least claims thereby to be

WA 10235106.2

protected by the doctrine of tribal immunity.  *See* Doc. No. 1 at ¶ 2.  Plaintiff contends, on the

basis of a 2014 article posted on Al Jazeera America's website, that this claim of tribal identity

and immunity is meritless because WLCC was not properly formed under Oglala Sioux law.  *See*

*id.* at ¶¶ 2, 20-27.  Plaintiff contends that defendant Raines proposed the venture that ultimately

became WLCC to the Wakpamni District, a political subdivision of the Oglala Sioux tribe.  *See*

*id.* at ¶ 21.  Plaintiff alleges that the Wakpamni District board "rejected the business venture, but

Raines set up the WLCC with a few rogue members of the Wakpamni district[.]"  *Id.* at ¶ 24.

The Al Jazeera America article on which Plaintiff relies[2] suggests that WLCC was approved by a

floor vote at the meeting referred to in the Complaint, but that there was not a sufficient quorum

at the meeting to enable such a matter to be put to a floor vote, as opposed to a vote of the

Wakpamni District board:

> Two Lance realized she didn't have the votes she needed on the executive board.
> So she put the matter to a floor vote, a move that violated district rules because
> the meeting lacked a proper quorum.
>
> "If we make $2.50, that is $2.50 we didn't have before," said a member of the
> audience who seconded Two Lance's motion despite its procedural improprieties.
>
> Only one person in the meeting hall voted against the contract.  Little Hawk and
> the two other board members abstained in protest.

Exhibit A hereto at 6-7.  Plaintiff additionally alleges that the Oglala Sioux tribe is not involved

in and has disavowed WLCC.  *See* Doc. No. 1 at ¶ 25.  She alleges that WLCC "operates without

approval from and provides no benefit to the Oglala Sioux Tribe or any other tribe."  *Id.* at ¶ 14.

She alleges that no members of the Wakpamni District are involved in the day-to-day operations

---

2 *See* Doc. No. 1 at ¶ 20 n.3 ("A portion of the factual allegations are taken from Al Jazeera America's investigation into Raines and the WLCC[.]"); *see also id.* at ¶ 2 (citing the Al Jazeera America article).   This article is therefore incorporated by reference into the complaint and the Court may consider it in evaluating Sullivan's motion to dismiss without converting the motion into a motion for summary judgment. *See Abelman v. Wells Fargo Bank, N.A.*, 976 F. Supp. 2d 660, 662 (D. Md. 2013) ("In reviewing a motion to dismiss, courts may consider documents attached or incorporated by reference into the complaint.")

WA 10235106.2

of WLCC.  *See id.* at ¶ 36.  (Plaintiff acknowledges that Defendant Geneva Lone Hill ("Hill"), WLCC's president, is a member of the Oglala Sioux tribe, although she is characterized as being a "rogue" member of the tribe.  *See id.* at ¶ 13.)[3]  Plaintiff does not appear to dispute – as, indeed, she cannot – that if tribal immunity may be validly invoked her claims necessarily fail.  Whether or not Plaintiff has a case thus turns, fundamentally, on the question of whether or not tribal immunity may validly be invoked.  And that question, in turn, turns on a series of discrete factual and legal questions about the circumstances of WLCC's creation and its historical and current relationship to the Oglala Sioux tribe.  Do the facts and circumstances surrounding the genesis of WLCC bear any resemblance to the story related in the Al Jazeera America article (and incorporated by reference into the complaint)?  If they do, was there, in fact, not a sufficient quorum at that initial meeting?  Was a quorum required under either Oglala Sioux or Wakpamni District law to take the action that was taken to create WLCC?  What role have members of the Oglala Sioux and/or residents of the Wakpamni District had in WLCC's operations?  What benefit has WLCC provided to the Oglala Sioux tribe or the Wakpamni District?  Is WLCC now

---

3 As a back-up argument, Plaintiff contends that even if WLCC were an "economic subdivision[] of the tribe" tribal sovereign immunity would still not apply because WLCC is not "analogous to a government agency, which would benefit from sovereign immunity" and is "more like a 'commercial business enterprise[.]'"  See Doc. No. 1 at ¶ 3, quoting *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010).  The law is more complicated than Plaintiff claims; analysis of a claim of tribal sovereign immunity by an entity like WLCC requires balancing numerous factors.  *See Everette v. Mitchem*, 146 F. Supp. 3d 720, 723 (D. Md. 2015) ("To determine whether an entity is entitled to sovereign immunity as an 'arm of the tribe,' courts examine several factors, including: '(1) the method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities.'"), quoting *Breakthrough Mgmt.*, 629 F.3d at 1181.  Needless to say, the evidence relating to each of those factors is located entirely on the Oglala Sioux reservation in the possession of WLCC and other tribal members.  This argument thus also points towards the Oglala Sioux tribal court as the appropriate forum to resolve this dispute.  (It should also be noted, of course, that this Court has previously recognized that a "payday" lending operation can be an "arm of the tribe" that can assert a valid claim of sovereign immunity.  *See Everette*, 146 F. Supp. 3d at 723-725.)

16

recognized by the Oglala Sioux tribe and/or the Wakpamni District?  Has it ever been?  Under Oglala Sioux and/or Wakpamni District law, can subsequent recognition cure any defects that may have been present in WLCC's inception?  The answers to these questions will require the testimony of witnesses who reside on the Oglala Sioux reservation and in the Wakpamni District thereof and the production and review of documents likely in the possession of third parties located there.  It will also require the interpretation of Oglala Sioux and Wakpamni District law.  Such matters are most effectively, and most appropriately, addressed before an Oglala Sioux tribal court.  This action should therefore be dismissed pursuant to either *forum non conveniens* or the tribal exhaustion doctrine.

### 1. Under the Doctrine of *Forum Non Conveniens*, the Appropriate Forum for this Dispute is an Oglala Sioux Tribal Court.

Under the doctrine of *forum non conveniens*, a defendant may obtain dismissal of the action in favor of a superior foreign forum if it can show that an alternative forum is "available and adequate" and that the balance of the public and private interest factors enumerated by the courts favor that forum.  *See Fidelity Bank PLC v. N. Fox Shipping N.V.*, 242 Fed. Appx. 84, 90 (4th Cir. 2007).  A forum is "available" when the defendants are amenable to process in that forum.  *Id.*  It is adequate if "(1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy all the same benefits as they might receive in an American court."  *Id.*

If the movant can establish that an adequate and available forum exists, the Court must consider and weigh a number of private and public interest factors to determine whether an alternative forum (here, an Oglala Sioux tribal court) is the more appropriate forum in which the litigation should proceed:

WA 10235106.2

To determine whether a forum non conveniens dismissal is appropriate, federal courts should evaluate both private and public factors. The relevant private interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining willing witnesses; and (4) other practical problems involving the efficiency and expense at trial…. The public interest factors consist of the: (1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided "at home;" (3) interest in having a trial of a diversity case in a forum that is familiar with the law that must govern the action; (4) avoidance of unnecessary problems of conflict of laws, or in the application of foreign law; and (5) unfairness of burdening citizens of an unrelated forum with jury duty.

*CSS Antenna, Inc. v. Amphenol-Tuchel Elecs., GmbH*, 764 F. Supp. 2d 745, 755 (D. Md. 2011). Here, the Oglala Sioux tribal court is an adequate available forum and the public and private factors point overwhelmingly to the Oglala Sioux tribal court as the correct forum.

### a. The Tribal Court is an Available and Adequate Forum.

The Oglala Sioux tribal court is an adequate and available alternate forum. It is an available forum because Defendants are all subject to its process in that court. *See Fidelity Bank*, 242 Fed Appx. at 90. Under the Oglala Sioux Tribe Law and Order Code, which provides the rules of civil procedure for the Oglala Sioux tribal court, service of process in any action before the Oglala Sioux tribal court "may be made anywhere in the United States pursuant to the law of that jurisdiction." *See* Exhibit B at § 20.3(e).

Likewise, the Oglala Sioux tribal court is an adequate forum. All the parties are subject to its jurisdiction. Hill is a member of the tribe. *See* Doc. No. 1 at ¶ 13. WLCC is, or at least holds itself out as, an organ of the tribe. *See id.* at ¶ 14. Raycen Raines and Ashley Blake Collins are both alleged to have had extensive dealings with the tribe that relate directly to the subject matter of this litigation. *See, e.g., id.* at ¶¶ 11-12. Sullivan consents to tribal jurisdiction. Plaintiff may consent to the jurisdiction of the Oglala Sioux tribal court as well. *See Smith v.*

18

WA 10235106.2

*Salish Kootenai College*, 434 F.3d 1127. 1136 (9th Cir. 2006) ("Smith could and did consent to the civil jurisdiction of the Tribes' courts.")

Moreover, the Oglala Sioux tribal court is an adequate forum because Plaintiff will not be deprived of all remedies and will be treated fairly. "Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65 (1978). Tribal court jurisdiction has been recognized as especially appropriate where the non-member is the plaintiff. Where, as here, "the nonmembers are the *plaintiffs*, and the claims arise out of commercial activities within the reservation, the tribal courts may exercise civil jurisdiction." *Salish Kootenai College*, 434 F.3d at 1132 (citing *Williams v. Lee*, 358 U.S. 217 (1959)) (emphasis in original). Moreover, the remedies available in the Oglala Sioux tribal court are substantially identical to those available in this Court. The Oglala Sioux tribal court can award monetary damages. *See* Exhibit B at § 22.1. It can award punitive damages. *See id.* at § 22.2. It can award costs. *See id.* at § 23. It can issue temporary restraining orders and preliminary injunctions. *See id.* at §§ 20.23 and 20.24. Certainly, Plaintiff will not be deprived of ***all*** remedies in the Oglala Sioux tribal court. It is an adequate available alternative forum.

### b.      The Private Factors Favor the Tribal Court.

In this case, the private interest factors uniformly point towards the Oglala Sioux tribal court as the more appropriate venue. The private interest factors are all, ultimately, about access to evidence, whether testimonial or documentary. As discussed above, the evidence that will prove or disprove Plaintiff's claims is all, or virtually all, located on the Oglala Sioux reservation. The witnesses who can testify about the creation of WLCC presumably all reside

there.  Certainly, none reside in Maryland.  The same is true for the witnesses who can testify concerning WLCC's subsequent activities, its involvement in the life of the tribe and the lives of tribe members, and whether its activities are governmental or commercial in nature.  Likewise, the official records of the Wakpamni District and of the Oglala Sioux tribe – the documents that would demonstrate, *inter alia*, whether WLCC was in fact a *bona fide* tribal entity or was, as Plaintiff alleges, a sham – are located on the reservation.  The same is true of WLCC's records, including but not limited to, the records showing the identity of the members of the putative class of Marylanders to whom it made loans.  Especially if, as now appears likely, WLCC does not participate in litigation before this Court and a default judgment is entered against it, the remaining parties will have no ability at all to get that information through party discovery and will have to obtain it through third-party subpoenas, which will have to be issued by the Oglala Sioux tribal court.  In other words, even if this matter remains before this Court, the overwhelming majority of the substantive discovery will be taking place in the Oglala Sioux tribal court anyway.  This is precisely the kind of grossly inefficient baby-splitting that the doctrine of *forum non conveniens* is intended to help prevent.  It will be far more convenient and efficient, for all sides, for the parties to rip off the proverbial Band-Aid® and litigate the entire case in the Oglala Sioux tribal court than to maintain the illusion that this action will proceed here while requiring the parties to open dozens of miscellaneous actions in the tribal court to conduct merits discovery.

### c.  The Public Factors Favor the Tribal Court.

The public interest factors also point towards the Oglala Sioux tribal court being the appropriate forum for this matter to proceed.  Ultimately, this case is about whether or not WLCC is a *bona fide* tribal entity that enjoys the protections of tribal immunity by virtue of its

WA 10235106.2

connection with the Oglala Sioux tribe and the Wakpamni District.  That is a localized controversy that ought to be decided "at home" by the Oglala Sioux themselves.  Moreover, it is a controversy that turns on questions of Oglala Sioux law that are more conveniently and efficiently resolved in a court that is familiar with that law.  *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987) ("[T]ribal courts are best qualified to interpret and apply tribal law."); *see also Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe*, 117 F.3d 61, 66 (2d Cir. 1997) ("The Supreme Court has long recognized the exclusive responsibility of Native American tribes to construe their own law[.])"[4]  Likewise, Maryland jurors have little actual interest in deciding whether WLCC is a *bona fide* Oglala Sioux entity or not, whereas the members of the tribe, who would serve as the jurors before the tribal court, have a significant interest in that issue.

While there is, obviously, a Maryland connection to this suit as well – in both the scope of the putative class and the state-law claims – the Oglala Sioux law questions and issues are ultimately superior.  Without waiving any substantive defenses under Maryland law, it is fair to say that Sullivan's (and all the Defendants') defenses will turn almost in their entirety on the question of the legitimacy of WLCC's claim of tribal immunity.  If WLCC is and was a *bona fide* tribal entity, then tribal immunity applies and bars this suit.  *See Everette*, 146 F. Supp. 3d at 723-25.  If WLCC is not a genuine Oglala Sioux entity and Maryland law governs the claims and it is likely – at least, on the face of the Complaint – that the loans WLCC made were usurious under Maryland law and Sullivan will likely be limited to the defenses that he did not participate in the alleged scheme and lacked the requisite *mens rea* to commit any violation.  Sullivan

---

4 It should additionally be borne in mind that the Loan Agreement, on its face, calls for the application of tribal law.  *See* Doc. No. 1-1 at 6.  Plaintiff challenges the enforceability of this provision on various grounds but, if it is enforceable, it will mean that Oglala Sioux substantive contract law will govern this suit **even if WLCC does not have a valid claim of tribal immunity**.  This is yet another reason that an Oglala Sioux tribal court is the most logical forum to hear this dispute.

WA 10235106.2

respectfully submits that the efficiencies generated by having the Oglala Sioux tribal court resolve the factual and legal questions surrounding WLCC's legitimacy substantially outweigh whatever benefit would be derived from affording this Court the opportunity to interpret Maryland state law on Sullivan's remaining defenses.

   **d.    Neither Federal Question Jurisdiction Nor Plaintiff's RICO Claims Preclude Dismissal Under *Forum Non Conveniens*.**

   The fact that some of Plaintiff's clams are grounded in the federal RICO statute is not a basis to refuse to dismiss in favor of the Oglala Sioux tribal court.  To the contrary, "[f]ederal courts have refused to afford RICO claims special treatment in *forum non conveniens* inquiries and have found dismissal on this basis proper in cases involving RICO claims."  *Windt v. Qwest Comms. Int'l, Inc.*, 529 F.3d 183, 193 (3d Cir. 2008) (citing cases).  More generally, the presence of federal questions jurisdiction, grounded in claims arising under federal statutes, does not operate as a bar to dismissal under the doctrine of *forum non conveniens.  See Orthopaedic & Spine Center, LLC v. Henry*, Case No. 2:16-cv-0893, 2017 WL 6035234, at *2-3 (S.D. Ohio Dec. 6, 2017) (existence of federal question jurisdiction based on plaintiff's claim under the federal Computer Fraud and Abuse Act did not preclude the court from entertaining and granting a motion to dismiss under the doctrine of *forum non conveniens*).  Moreover, because the Oglala Sioux tribal court applies "any laws of the United States that may be applicable" in civil actions (*see* Exhibit B at § 21), there is every reason to believe that Plaintiff will be able to assert her RICO claims in front of the Oglala Sioux tribal court.

   **e.    Plaintiff's Choice of the District of Maryland is Not Entitled to Greater Deference  Because This is Not Her "Home" Forum.**

   When a plaintiff sues in her "home" forum, her choice of forum is entitled to heightened deference.  *See DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 802-03 (4th Cir. 2013).

WA 10235106.2

However, in this action, Plaintiff is not entitled to such deference because Maryland is not her "home" forum. Plaintiff is a citizen of Kentucky. *See* Doc. No. 1 at 1 (identifying Plaintiff's city of domicile as Louisville, Kentucky). Although she alleges that she was formerly a Maryland citizen (*see id.* at ¶ 9), it is undisputed that she is not currently a Marylander. An American's "home" forum, for *forum non conveniens* purposes, is the state in which she is domiciled. *See Gemini Capital Group, Inc. v. Yap Fishing Corp.*, 150 F.3d 1088, 1091-92 (9th Cir. 1998) (California resident not entitled to strong deference to choice of Hawaii forum because Hawaii was not his home forum); *Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V.*, 145 F.3d 505, 510 (2d Cir. 1998) (plaintiff's choice of forum entitled to special deference "where the plaintiff resides in the forum state"). Moreover, even if Maryland were her home forum, "choice of home forum is not a dispositive issue" and may be overcome if the overall *forum non conveniens* analysis points sufficiently strongly in the direction of the alternate forum. *See Wong v. PartyGaming Ltd.*, 589 F.3d 821, 833 (6th Cir. 2009).

### f.     Dismissal Under *Forum Non Conveniens* is Warranted.

This Court may dismiss this action under the doctrine of *forum non conveniens* pursuant to its inherent powers. *See Grodinsky v. Fairchild Indus., Inc.*, 507 F. Supp. 1245, 1248 (D. Md. 1981) ("[F]ederal district courts have inherent power to dismiss a suit pursuant to the doctrine of forum non conveniens.") Although transfer pursuant to 28 U.S.C. § 1404 is the more commonly invoked remedy under *forum non conveniens*, the Court's inherent power to dismiss the action may be exercised "when there exists an alternative forum and transfer under section 1404(a) is not an option[.]" *Id.* at 1249. Such is the case here. Under Section 1404(a), the Court can only transfer the action to another federal district court. *See* 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any

WA 10235106.2

civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."); *see also Heldt v. Payday Fin., LLC*, 12 F. Supp. 3d 1170, 1178 (D.S.D. 2014) (transfer under Section 1404(a) was unavailable where the destination forum is a tribal court); *MTR Gaming Group, Inc. v. Arneault*, 899 F. Supp. 2d 367, n.3 (W.D. Pa. 2012) ("transfer of the present case to a nonfederal forum under § 1404 is not an option").  Therefore dismissal, and re-filing by Plaintiff in the Oglala Sioux tribal court, is the appropriate remedy.

### 2.    Dismissal Under the Tribal Exhaustion Doctrine is Appropriate.

Tribal exhaustion doctrine provides an alternative basis for dismissing the Complaint. "The tribal exhaustion doctrine holds that when a colorable claim of tribal court jurisdiction has been asserted, a federal court may (and ordinarily should) give the tribal court precedence and afford it a full and fair opportunity to determine the extent of its own jurisdiction over a particular set of claims."  *Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Auth.*, 207 F.3d 21, 31 (1st Cir. 2000); *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1507 (10th Cir. 1997) ("[F]ederal courts should abstain when a suit sufficiently implicates Indian sovereignty or other important interests.").  Where there is a colorable claim that a tribal court has subject-matter jurisdiction over the dispute, principles of comity and respect for the sovereignty for the sovereignty of Native American tribes require that question to be heard, initially, in a tribal court:

> [T]he federal policy supporting tribal self-government directs a federal court to stay its hand in order to give the tribal court a full opportunity to determine its own jurisdiction.  In diversity cases, as well as federal-question cases, unconditional access to the federal forum would place it in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs.  Adjudication of such matters by any nontribal court also infringes upon tribal law-making authority, because tribal courts are best qualified to interpret and apply tribal law.

*Iowa Mut.*, 480 U.S. at 16 (internal quotation marks and citations omitted); *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856 (1985) ("We believe that examination should be conducted in the first instance in the Tribal Court itself."); *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916, 920 (9th Cir. 2008) ("Principles of comity require federal courts to dismiss or to abstain from deciding claims over which tribal court jurisdiction is 'colorable.'")

Tribal exhaustion doctrine requires that even matters involving claims arising off the reservation be heard first in the tribal court where they have an impact on tribal affairs. *See Ninigret Development*, 207 F.3d at 32 ("To trigger exhaustion, an 'off-the-reservation' claim must at a bare minimum impact directly on tribal affairs.")  Contract disputes between non-members and the tribe, or a subdivision thereof, are thus subject to the doctrine. *See id.* ("Courts regularly have held that a contract dispute between a tribe and an entity doing business with it, concerning the disposition of tribal resources, is a tribal affair for the purposes of the exhaustion doctrine."); *see also Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians*, 317 F.3d 840, 849 (8th Cir. 2003) ("Other circuit courts have also applied the tribal exhaustion doctrine to cases involving questions of … validity of contracts.")

*Hayes* is not to the contrary.  In that case, the tribal entity was not a party and plaintiff's claims arose out of the violations of the Fair Debt Collection Practices Act and the Telephone Consumer Protection Act by a non-tribal debt collector. *See* 811 F.3d at 669.  The tribal connection was thus peripheral to the case and neither the plaintiff's claims nor the debt collector's substantive defenses related at all to the tribal affiliation of the underlying original lender.  The district court thus rejected the tribal exhaustion claim because "the conduct at issue in this action did not involve an Indian-owned entity, did not occur on the Tribe's reservation, and did not threaten the integrity of the Tribe." *Id.* at 676 n.3 (alterations in original omitted).

Here, in contrast, WLCC, which is, or at least holds itself out as, a Native American-owned entity, is a defendant. Moreover, this suit threatens the integrity of the Oglala Sioux tribe. If WLCC is in fact, as it has claimed, a *bona fide* tribal entity intended to raise revenues for the tribe and/or the Wakpamni District then any money judgment against WLCC will, ultimately, be coming out of the tribal coffers, threatening the tribe's fiscal integrity. And even if there were no monetary threat, maintaining this action, maintaining this suit is a threat to the tribe's dignitary interest in shielding tribal entities from suit.

Nor does the fact that there is not presently any parallel proceeding in the Oglala Sioux tribal court preclude the application of the doctrine of tribal exhaustion. It is well established that "[t]he absence of any ongoing litigation over the same matter in tribal courts does not defeat the tribal exhaustion requirement." *Marceau*, 540 F.3d at 921; *see Sharber v. Spirit Mountain Gaming, Inc.*, 343 F.3d 974, 976 (9th Cir. 2003); *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 81-82 (2d Cir. 2001); *Ninigret Development*, 207 F.3d at 31; *U.S. v. Tsosie*, 92 F.3d 1037, 1041 (10th Cir. 1996); *Texaco, Inc. v. Zah*, 5 F.3d 1374, 1376 (10th Cir. 1993); *U.S. v. Plainbull*, 957 F.2d 724, 728 (9th Cir. 1992); *Heldt*. 12 F. Supp. 3d at 1180.

There is no reason for this matter not to be heard, in the first instance, in an Oglala Sioux tribal court. It is not merely the case that the tribal court is the most efficient forum to determine whether WLCC is a *bona fide* tribal entity, although, as discussed above, it is. It is also the most **appropriate** forum for that determination to be made – the forum in which fundamental principles concerning tribal sovereignty can best be respected. If, as Plaintiff claims, WLCC is a fraud – if the tribe has indeed refused to legitimate it or its activities – then respect for tribal sovereignty commands that the **tribe** be permitted to say so, by adjudicating the matter in its courts. On the other hand, if WLCC is in fact, as it claims, a legitimate arm of the tribe, then it is

26

for the tribe to so declare, through the mechanism of its courts.  Either way, it should be for the tribe to decide the legitimacy of WLCC, not this Court.  Respectfully, the answer to the question of whether or not WLCC is a genuine tribal entity should not be imposed upon the Oglala Sioux by a jury of a dozen Marylanders and a federal district court sitting 1,500 miles away.

### B.     The Court Should Dismiss Under Fed. R. Civ. P. 12(b)(6).

In the alternative, if this Court declines to compel arbitration or to dismiss in favor of an Oglala Sioux tribal court, it should nevertheless dismiss the action pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  The Complaint fails to state a claim with regard to her state-law claims because Sullivan was not a "lender" within the meaning of the relevant statutes and the Complaint fails to plausibly allege a basis to hold him vicariously liable for the actions of the entity alleged to have lent the money, and because her state-law claims are time-barred. Plaintiff's RICO claims against Sullivan fail due to the lack of a viable underlying state-law claim for usury. Additionally, Plaintiff fails to allege that she suffered economic injury as a result of Sullivan's conduct – and, indeed, the allegations in the Complaint most plausibly indicate that she in fact profited from the underlying transaction – which operates as a bar to her RICO claim.

### 1.     The Complaint Fails to State a Claim on the State-Law Claims.

#### a.     The Complaint Fails to Plausibly Allege Any Basis for Holding Sullivan Personally Liable for Any Violation of State Law.

The Complaint contains no non-conclusory allegations of any conduct by Sullivan personally.  Sullivan was not the lender on the at-issue loan.  The loan was allegedly made by Seaside Payday, LLC ("Seaside").  *See* Doc. No. 1-1 at 4; *see also* Doc. No. 1 at ¶ 54.  Sullivan's name is not included anywhere on the Loan Agreement.  *See generally* Doc. No. 1-1.  The gravamen of Plaintiff's complaint, under both her RICO and her state-law theories, is the making

of an allegedly usurious loan.  But Seaside is the entity that is alleged to have made that loan.  To the extent that Plaintiff's claims have merit, it is Seaside that would be liable.

The fact that Sullivan was not the lender is fatal to Plaintiff's state-law claims.  Section 12-102 of the Maryland Commercial Code, which establishes the prohibition on usurious loans, applies, on its face, only to the person or entity that makes the loan and charges interest thereon.  *See* MD. CODE ANN. COM. LAW § 12-102 ("Except as otherwise provided by law, a person may not charge interest in excess of an effective rate of simple interest of 6 percent per annum on the unpaid principal balance of a loan.")  Indeed, Section 12-103, which creates certain carve-outs from the general rule regarding usurious loans, applies on its face to "lenders."  *See, e.g., id.* at § 12-103(a)(1) ("Except as provided in subsections (b), (c), (d), (e), and (f) of this section, a **lender** may charge interest at an effective rate of simple interest not in excess of 8 percent per year on the unpaid principal balance of the loan if there is a written agreement signed by the borrow which sets for the stated rate of interest charged by the lender.") (emphasis added).  Similarly, Section 12-122, which establishes criminal sanctions for willful violations, applies on its face only to "lenders."  *See id.* at § 12-122 ("Any **lender** who knowingly and willfully violates any provision of … this subtitle is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $500, or imprisonment not exceeding 6 months, or both.") (emphasis added).  The statutory definitions make explicit that the term "lender" applies only to "a person who makes a loan under this subtitle."  *Id.* at § 12-101(f).  Thus, since Sullivan is not alleged to have been the lender on Plaintiff's alleged loan (or on the alleged loans of the putative class members), he cannot be liable for any violations of MD. CODE. COM. LAW § 12-101 *et seq.* and Count III of the Complaint must be dismissed.

WA 10235106.2

Similar provisions apply to Maryland's Consumer Loan Law, the subtitle of Maryland's Commercial Code that allegedly supplies the basis for Count IV of the Complaint.  Under the definitions sections applicable to that subtitle of the code, "lender" is defined to mean "a person who makes a loan under this subtitle."  *See* MD. CODE COM. LAW § 12-301(c).  Section 12-306, on which Plaintiff relies as part of the basis for her claim, explicitly applies only to lenders.  *See id.* at § 12-306(a)(1) ("Except as provided in subsections (b) and (c) of this section, a **lender** may charge interest on a loan at a rate not more than the rates specified in this subsection.") (emphasis added).  The same is substantially true of Section 12-314, on which Plaintiff also relies as part of the basis for Count IV.  *See id.* at 12-314(a) ("A person may not lend $6,000 or less if the person directly or indirectly contracts for, charges, or receives a greater rate of interest, charge, discount, or other consideration than that authorized by the laws of this state.")  Thus, as with Count III, the fact that Sullivan has not been alleged to have been the "lender" on the loans at issue in this litigation is dispositive as to whether Plaintiff has stated a claim against Sullivan under Count IV.

Nor is there any basis on the face of the Complaint to hold Sullivan derivatively liable for Seaside's conduct.  While the complaint alleges that Sullivan was an owner of Seaside (*see* Doc. No. 1 at ¶ 10), corporate officers, directors and investors are not generally held liable for the conduct of the corporations with which they are associated.  Indeed, as this Court has noted, the proposition that a principal may not be held personally liable for the conduct of the corporation, absent a basis for piercing the corporate veil, is one of "the most basic tenets of corporation law." *Birrane v. Master Collectors, Inc.,* 738 F. Supp. 167, 169 (D. Md. 1990).

The Complaint does not present facts anywhere close to sufficient to demonstrate the required elements for piercing the corporate veil under an alter ego theory under Maryland law. To establish alter ego, Plaintiff must allege facts creating a plausible inference of "(1) complete

WA 10235106.2

domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity as to the transaction had at the time no separate mind, will or existence of its own, (2) that such control was used by the defendant to commit fraud or wrong, to perpetuate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights, **and** (3) that such control and breach of duty proximately caused the injury or unjust loss." *Hildreth v. Tidewater Equip. Co.*, 378 Md. 724, 735 (Md. Ct. App. 2003) (emphasis added). There are no allegations of "complete domination" or "control" over Seaside (or WLCC) by Sullivan, nor any allegations that any putative control of such entities was used to perpetrate a fraud against Plaintiff or violate her legal rights, nor any allegations that the (unalleged) control "proximately caused" her damages. Nor are there any allegations, conclusory or otherwise, relating to the "factors commonly considered" in evaluating an alter ego argument, as identified by the *Hildreth* court:

> (1) whether the corporation is inadequately capitalized, fails to observe corporate formalities, fails to issue stock or pay dividends, or operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (5) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records.

*Id.* In the absence of such allegations, the Complaint fails to adequately allege alter ego, and there is thus no basis to hold Sullivan vicariously liable for the direct making of an allegedly usurious loan by Seaside.

### b.      Plaintiff's State-Law Claims Are Time-Barred.

Additionally, the statute of limitations bars at least Plaintiff's state-law claims. Plaintiff took out the loan on which she now seeks to sue on July 1, 2013. *See* Doc. No. 1-1 at 9. She filed this action just under four years later, on June 30, 2017. *See* Doc. No. 1. However, Maryland state-law claims are subject to a three year statute of limitations. They are thus time-

barred and must be dismissed.[5]  Under Maryland law, the default statute of limitations for civil actions is three years.  *See* MD. CODE ANN., CTS. & JUD. PROC. § 5-101 ("A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different time within which an action shall be commenced.")  Neither Maryland's usury statute (MD. CODE ANN., COM. LAW § 12-101, *et seq,*) nor Maryland's consumer loan law (MD. CODE ANN., COM. LAW § 12-301, *et seq.*) contain an express statute of limitations.  They therefore fall within the catch-all language of Section 5-101 and are subject to a three-year statute of limitations.  Since this suit was commenced nearly four years after the allegedly usurious loans were made, the state-law claims are time-barred and must be dismissed.

### 1.    The Complaint Fails to State a Claim on the RICO Counts.

#### a.    Plaintiff's RICO Claims Are Insufficient Because She Has Failed to Properly Allege an Underlying Usury Claim.

For the reasons set forth above, Plaintiff has failed to allege a viable underlying claim for usury against Sullivan.  This is fatal to Plaintiff's RICO claims, which are premised on the allegedly violation of Maryland's usury statute.  *See* Doc. No. 1 at ¶¶ 78-80, 93.  The case law is clear: if the underlying state-law usury claim is legally insufficient, the derivative RICO claim must also be dismissed.  *See Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 444 (5th Cir. 2004) ("Because Texas law does not construe such credit service fees as disguised interest, Lovick's complaint fails to state a claim for usury.  Therefore, her RICO claim also fails."); *Belizan v.*

---

5 Plaintiff's RICO claims are arguably time-barred as well under the same three-year statute of limitations.  *See Arrington v. Colleen, Inc.,* Civil No. AMD 00-191, Civil No. AMD 00-421, 2000 WL 34001056, at *9 (D. Md. Aug. 7, 2000) ("Since no statute of limitations is contained in the statute, RICO looks to state law for the most analogous claim and applies the appropriate state law statute of limitations.  Since there is no state analogue to the civil RICO claim asserted here, the most appropriate statute of limitations is the general three year statute of limitations provided by MD. CODE ANN., CTS. & JUD. PROC. § 5-101.")  (internal citations omitted); *but see Pitkin v. Ocwen Fin. Corp.*, Civil Action No. 8:12-cv-00573-AW, 2012 WL 5986480, at *4 (D. Md. Nov. 27, 2012) ("RICO, for its part, has a four-year statute of limitations for private enforcement actions.").

WA 10235106.2

*Easy Money of Louisiana, Inc.*, No. CIV. A. 00-2949, 2002 WL 31115249, at *2 (E.D. La. Sept. 19, 2002) (dismissing RICO claim because plaintiff "failed to state a claim under Louisiana law and, as such, no RICO predicate acts (collection of unlawful debts) have occurred"); *Nelson v. Nationwide Mortg. Corp.*, 758 F. Supp. 747, 749 (D.D.C. 1991) (plaintiff could not maintain RICO claim for collection of unlawful debt because underlying loans were not prohibited by Virginia's usury statute).  Because Plaintiff's claims against Sullivan under the Maryland usury statute are legally insufficient, her derivative RICO claims are also legally insufficient and Counts I and II must be dismissed.

### b.    Plaintiff's RICO Claims Are Insufficient Because Plaintiff Has Failed to Allege That She Suffered Any Economic Injury.

Economic damage is an essential element of a civil claim asserting a private right of action under RICO.  *See* 18 U.S.C. 1964(c) ("Any person **injured in his business or property** by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court[.]")  To establish this element a plaintiff must plead and prove an actual monetary loss.  *See Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) ("The injury to business or property element of section 1964(c) can be satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss.")  To adequately plead a civil RICO claim, Plaintiff must allege that she "suffered a specific, tangible financial injury."  *In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.*, 941 F. Supp. 528, 540 (D. Md. 1996).

In this action, Plaintiff makes only conclusory allegations of injury.  *See* Doc. No. 1 at ¶ 82 ("Plaintiff and the putative class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c)[.]"); *id.* at ¶ 94 ("Plaintiff and the class members suffered actual damages as a result of Defendants' violations of 18 U.S.C. § 1962(d).")  These conclusory allegations, in addition to being insufficient under *Iqbal* and *Twombly*, are also belied by the specific factual

WA 10235106.2

allegations found elsewhere in the Complaint, which are most plausibly read to suggest that Plaintiff, in fact, was a net beneficiary financially from the transaction that allegedly serves as the basis for her putative RICO claims.  Specifically, Plaintiff alleges that she took out a loan in the amount of $500.  *See id.* at ¶ 46.  She alleges that she paid back "no less than $450.00" on that loan.  *See id.* at ¶ 54.  Taking these allegations as true, they tend to show on their face, not a loss, but a gain of approximately $50 on the at-issue transaction.  (Plaintiff's tortured "not less than $450.00" phraseology notwithstanding, the clear upshot of this allegation is that she has not repaid the full $500 she borrowed, let alone more than that.  If she had suffered a net financial loss from the transaction, she would have said so explicitly, and not relied on evasive circumlocution.)[6]  It is axiomatic that a gain cannot be a loss and that, having profited from the transaction, she cannot have "suffered a specific, tangible financial injury."  She therefore cannot satisfy the economic injury element of a RICO claim and dismissal of Counts I and II of the Complaint is warranted.

## CONCLUSION

For the foregoing reasons, Sullivan respectfully requests that the Court grants his motion and either stay the case and compel arbitration or, in the alternative, dismiss this action pursuant to Fed. R. Civ. P. 12(b)(6) and/or under this Court's inherent equitable powers.

Respectfully submitted,

   /s/ Patrick A. M<sup>c</sup>Inerney
Patrick A. M<sup>c</sup>Inerney (*pro hac vice*)

---

6 In this respect, Plaintiff's counsel is to be commended for their scrupulous honesty and fidelity to the dictates of Rule 11.  It would have been easy to allege that the loan had been repaid in full, and with interest, in order to avoid a Rule 12 motion to dismiss on this issue, regardless of whether such an allegation was borne out by the facts.  However, with their pre-suit investigation having presumably revealed that Plaintiff paid back less than the principal amount that she borrowed, Plaintiff's counsel did not assert unsupportable allegations, however much such allegations would have helped their litigation position.  This is to their credit.

WA 10235106.2

Angus W. Dwyer (*pro hac vice*)
SPENCER FANE LLP
1000 Walnut Street, Suite 1400
Kansas City, Missouri 64105
Tel: (816) 474-8100
Fax: (816) 474-3216
pmcinerney@spencerfane.com
adwyer@spencerfane.com


Paula M. Junghans (Trial Bar No. 586)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, D.C. 20036-5807
Tel: (202) 788-1800
Fax: (202) 882-8106
pjunghans@zuckerman.com


*Counsel for Defendant Ryan Sullivan*

WA 10235106.2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 1st day of May, 2018, a true and correct copy of the foregoing was filed electronically with the Court's ECF system, which transmitted copies of the foregoing to all counsel of record and all unrepresented parties who have appeared in this action.

  /s/ Patrick A. M$^{c}$Inerney
An Attorney for Defendant Ryan Sullivan

WA 10235106.2